# THE SUPREME COURT

OF

# PENNSYLVANIA.

MIDDLE DISTRICT, JUNE TERM, 1831.

[SUNBURY, JUNE, 1831.]

## STERRETT'S APPEAL.

The Orphans' Court, in the settlement of an administration account, are not bound by the technical rules of evidence; for sitting as a Court of Chancery, they may receive secondary evidence, and either decide on it, if necessary, or send the fact, intended to be established, to be decided by a jury.

One executor, barely permitting a co-executor to receive money, where there are no grounds to suspect danger of losing it, does not make him liable therefor: but when one executor has money actually in his hands, and pays it over to the other, or when he actively assists to have it put into the hands of the other, he is generally liable.

It is the duty of the Orphans' Court, to allow to executors and administrators, in the settlement of their accounts, a credit for payments made to heirs or distributees. And herein of the manner in which such allowance should be made and stated.

The allowance to executors and administrators for services in settling the estate must be regulated by all the circumstances attending it; and herein, as of what time such allowance should be made.

When an estate is so situated, that legal advice is proper to direct the course of the executors, the reasonable counsel-fees paid by them, are a just charge against the estate.

When an executor presents an administration account to the Orphans' Court, which exhibits a balance in his favor; but which being referred to auditors, their report exhibited a balance against the accountant, he, and not the heirs, should be charged with the expense of such reference.

APPEAL from the Orphans' Court of *Mifflin* county.

This case was argued at June term, 1828, when it was referred to auditors, with the following opinion of the court, which was delivered by

Huston, J.—*James Sterrett*, in 1812, made his brothers, *John*
*Sterrett, Robert Sterrett*, (and *William McClure* who renoun-
ced,) executors of his estate, and died soon after. *Robert* and *John*
*Sterrett*, proved the will, and letters testamentary were granted to
them. The estate, both real and personal, was large. In March,
1815, the eldest son cited the executors to settle their account, and
this was followed by repeated citations, up to the autumn of 1816,
when an account was filed, and passed by the register, but on its being
presented to the Orphans' Court for confirmation was rejected, as it
would seem, because on the face of the account, large sums had
come to the hands of the executors, and much money was due by
them, yet no charge, or calculation of interest was made on those
sums, nor any reason stated why interest had not been charged.—
Soon after this, *John Sterrett* died. The matter rested several
years. *Robert Sterrett* then filed an account, in which he under-
took to distinguish the sums and parts of the administration of the
estate, transacted by himself, and for which only he alleged he was
answerable; and the part for which he alleged the representatives
of *John*, whose estate was admitted to be insolvent, were liable.
The Orphans' Court made a decree, charging *Robert* with a large
sum, from which this appeal was taken. Several exceptions were
stated in writing to this decree, which were not mentioned in the
argument, and which, therefore, I shall consider as abandoned, ex-
cept those which I shall notice.

The principal points discussed were

1. *Robert* alleged that in 1814, he having received from two of
the debtors of the estate sundry sums, viz: 804 dollars, and 100 he
paid them over to his brother and co-executors, and in May, 1815,
the further sums of 750 dollars, and 804 dollars. It appeared by
entries made by *John* in his life-time, that he did receive from
*Robert*, the three first sums, amounting to $904 in 1814, and $750
in 1815, but the receipt of the last sum of $804, was utterly de-
nied, and the proof adduced was as follows: "A son of *Robert*
*Sterrett's* produced a paper, he stated that in 1820, or 1821, he got
from the widow of *John Sterrett*, a paper in which, among other
things, *John* charged himself with this disputed item of $804, as
received from his brother and co-executor, *Robert*.

The original paper in *John Sterrett's* hand writing, and which
was by him left with his father, the accountant and appellant, was
lost, as appellant swore. The copy was objected to, but received
by the Orphans' Court; and rightly; for setting as a Court of Chan-
cery, they were right in receiving it, and either deciding on it, if
necessary in the case, or sending the fact to be decided by the ju-
ry. But in the view there taken, and here also, it was immate-
rial whether *Robert* paid, or did not pay over that sum to *John*,

(Sterrett's Appeal.)

To rebut this, the heirs offered in evidence the account filed with the register in 1816, by *Robert* and *John*, sworn to by both of them, though rejected for the reason above stated by the Orphans' Court.    In this account there was a specification of certain sums, as received by *Robert*, and certain others as received by, *John*, from debtors; and the three first sums above stated, as received from *Robert*, but not the disputed item of $804 in 1815. This was objected to, because it had been rejected by the Orphans' Court, but it was received; and rightly: for though not evidence as a record, or conclusive *as to what was on the face of it,* as it would have been, if passed and confirmed by the Orphans' Court, and not appealed from; yet it was a statement of the very matter in question, not only subscribed but sworn to by *Robert Sterrett* in the life-time of *John*, remaining on the files of the Register's Court, and was admissible and proper to be considered in deciding on the evidence adduced, to disprove this new item charged to *John* since his death; especially considering the kind of evidence adduced in support of it.

I have said both these questions, as to the admission of evidence, became immaterial, from the opinion of that court on this part of the cause, which decision was, "That *Robert Sterrett* was not discharged from his responsibility for those sums which he paid over to his co-executor, but continued liable, and must account for them.

How far one executor, administrator, or guardian, who has received the money of the estate or of the wards, and who, instead of keeping it, or seeing that it is properly applied, pays it over to his co-executor, co-administrator, or co-guardian and never more inquires about it, until it is lost, is answerable for such money, is an important question, and if not settled, ought to be—no difficulty could be made on this point, were it not for a decision of our own court, *Brown's Appeal,* 1 *Dall.* 311.    Although the cases in that book, are generally correctly reported, I am satisfied there is some omission as to the facts of that case.    It professes to be decided on the authority of 1st *Pr. Wms.* 242, which is said to be directly in point.    Now there is scarcely a feature of resemblance, as the facts are reported in *Dall.*    In the case in *Pr. Wms.* the insolvent executor actually received the money—it never was in the hands of the solvent executor.    The debtor it is true, when he paid the money, required and got the joint receipt of both executors, and the question was, whether the act of joining in the receipt, made the executor, who never had the money, liable; on the ground, that as his joining was not necessary, he ought, if he did join, to have a control over the money.    To meet this it was shown, that the executor who actually received the money, was a banker in

good credit, and with whom the testator, during his life, had kept large sums. In short, that case only decides, that under the circumstances, the bare fact of joining in the receipt did not make an executor liable who never received a penny of the money; and to a certain extent, it is still unshaken. The barely permitting a co-executor to receive money, and not looking to it, when there are no grounds to suspect danger of losing it, does not make a co-executor liable—but when one executor has money actually in his hands and pays it over to the other, or when he actively assists to have it put into the hands of the other, he is generally liable. I say generally liable; for I will not say there can be no possible case in which he would be excused. An executor having money due to creditors or legatees residing at a distance, and who was at the point of death, and knew it; or who, from misfortune, was for the time become totally insolvent, and on his way to a prison; and who, in such circumstances, paid over money to a co-executor in good circumstances and credit, might possibly be held not liable. I, however, give no opinion as to this or some other cases. I only mean to say as a general rule, an executor who has money in his hands, and pays it over to his co-executor, is liable; and I do not say, that no circumstances can exist, which will form an exception. What is the present case? As to the money paid over in 1814, no reason is given for this. *John* was, by the evidence, more a man of business than *Robert;* but this is too vague to found any rule on. It appears from the exhibits in this cause that *Robert* received this money in *Lancaster* county; that at the time he received it, the bond of *Vance* against his testator was, and had been many years, due; that he paid the interest on it, and instead of paying off and lifting the bond, brought the money home and gave it to his brother. As to the next year, there is still less excuse; before he received the money he had, together with *John*, been called on to settle their account as executors; his brother, though reputed rich, was, from the exhibits in this case, indebted deeply—about $7000 to one bank. Under such circumstances, it is idle to talk of excusing himself by saying he paid over this money to his brother; and useless, in this case, to inquire, whether he did or not? he is equally liable for it, whether he gave it to *John*, under such circumstances, or used it himself; hereafter it may be of some importance to him in a claim, which he may make for a dividend of *John's* estate. That is not before us. The court were right in deciding that he was liable to the representatives of his testator for this money, once in his hands, and given over to *John Sterrett*.

The next point discussed is, as to this bond of *Vance*, which was satisfied in 1815. The Orphans' Court charged *Robert* with all the money he received in that year, and they gave *John* credit for

(Sterrett's Appeal.)

paying off this bond to *Vance*.    In this we think there is error.
The uncontradicted proof is, that a certain *Cummins*, understand-
ing that these executors intended to pay off this bond, and wishing
to borrow money, made his own bond to *Vance*, and gave it to
*Robert Sterrett*, who went to *Vance* and paid him his money, and
lifted the bond of his testator; then gave *Vance* the bond of *Cum-
mins* with himself, and his brother *John* as co-obligor. ·*Vance*
accepted this bond, and gave *Robert Sterrett* the money to carry
to *Cummins*, and he gave it to him.    *Cummins* has since lifted
his bond by re-paying the money to *Vance* or his assignee.    Now
*Cummins* and all his concerns may be left out·of view; it has no-
thing to do with the matter before us.    .In plain terms, *Robert
Sterrett*, having received money of his testators, applied a part of
it to discharge this bond, and lifted it; he is therefore not to be char-
ged, without at the same time being credited, and the item of 800
dollars paid *Joseph Vance* about the 4th of April, 1815, is to be
credited to *Robert Sterrett*, and the interest thereon, from that
time until settlement of his account, amounting to $580 52, is *not*
to be charged to him.

To make these alterations it will be necessary to state the account
anew.    The part relating to *Robert* and to *John*, will each require
material alteration.    The representatives of *John* did not interfere
with this account; nor do they take any part here; but they ought
to have notice to attend before the auditors.    They are not, to be
sure, the representatives of *James Sterretts'* estate, nor can they
intermeddle with it: since the death of *John*, *Robert* is the sole
representative of *James'* estate; but the representatives of *John*
may settle, nay, may be compelled to settle, the account of *John*,
so far as he acted in *James'* estate, *John's* representatives may I
say, settle a separate account of all he did: it is true, they may per-
mit *Robert* to settle the whole estate of *James;* but if he separates
it, and makes distinct accounts for himself and *John*, it is the duty
of those who represent *John*, to see that the part of the account
which relates to him is correct.    *Robert* must therefore give notice
to them of the time and place of meeting of the auditors.

It has been objected that the Orphans' Court refused to give
*Robert* credit for moneys paid by him to the heirs of *James*.
There seems to be some misapprehension on this subject.    The act
of 1713, in every part of it, contemplates that the executors shall
not only exhibit an account as to the payment of debts, but also of
the payment to each of the legal representatives, of the share of
the personal estate which shall be due; and the 11th section express-
ly provides that, when any of the said minors attain their full age,
and the persons entrusted with the estate, shall have paid to such
minor his full share, he ·shall enter satisfaction therefor; "but in

54

case any of them refuse so to do, then the said court shall certify
how the said persons concerned have accounted and paid, which
shall be a sufficient discharge to the guardians and tutors, and to
the trustees, executors or administrators, who shall so account and
pay; and therefore all bonds entered into for the payment of such
orphans' portions, shall be delivered up and cancelled."   Several
other acts, I may say all other acts, contemplate a settlement with
the heirs as well as the creditors.   The act of the 13th March,
1815, *Purdon,* 386, states, whereas considerable inconvenience
has arisen, and may hereafter arise, by reason of persons dying in-
testate, whose heirs, or some of them, reside out of the state, who
have been advanced in the life-time of the intestate, and who re-
fuse or do not come forward to make known the amount of their
advancements and settle the estate, and the *administrators cannot
for this reason settle their accounts,* &c. &c., and then goes on
to provide a mode by which a settlement may be made.   It is clear
from these enactments, that the law contemplates a settlement with
all who have an interest in the estate, whether creditors or heirs;
but the creditors must be paid before the heirs can claim; and the
account showing the amount of assets and of debts, ought to be,
and must be, shown before any thing can be ascertained with pre-
cision as to the amount due each heir.   Administrators, however,
often have, where there is no doubt as to sufficiency of assets, paid
in part to the heirs before all the debts are paid, and these payments
have been brought into the account promiscuously with the payment
of debts.   This occasions difficulty in making a decree as to the
balance; and this court has, on more than one occasion, said this
was wrong.   The meaning is, executors or administrators should
exhibit an account of the assets, of the debts and credits of the es-
tate of decedents, the balance on which is the deficit of personal
assets; or is the fund from personal assets to be distributed, and with
this no account of payment to heirs of their distributive shares
ought to be blended; but when this is done, and at the same time,
and on the same paper, may and ought to be exhibited the payment,
if any, which have been made to each distributee; and showing the
balance still due and payable to them, or each of them, or, if the
fact is so, that the whole amount due has been paid them; and when
the whole appears to have been paid, the administrator is discharged
as above.   It is not, however, necessary that the executor or ad-
ministrator should subjoin this account to that respecting debts and
credits, to and from strangers, or that it should be exhibited at the
same time; but it is advisable, in many cases, that it should be; as
the balance in his hands may, by a late act, be transferred to the dock-
et of the Common Pleas, and entered as a judgment against him.
   The first account, however, showing the state of debts and cre-

(Sterrett's Appeal.)

dits, must be adjusted before any decree can be made as to distribution; and it has always been the practice, and rightly, to appeal from the decision of the Orphans' Court on the settlement of such account, and prior to any account with the heirs being investigated.

If, when the account is re-stated with dates, &c. it shall appear that any of the money paid over by *Robert* to *John*, was actually applied to discharge debts of the deceased, this court reserves the power of considering this at the confirmation of the account.

At June term, 1831, the auditors made a report, to which both parties filed exceptions, which were argued by

*Hall, S. Alexander* and *Potter* for appellants.

*Blanchard* for appellee.

The opinion of the court on these exceptions was delivered by

HUSTON, J.—This case is now before us on the report of the auditors, to whom it was referred to state the account, so as to exhibit what was done by the executors jointly; what was received and paid by each, and generally every matter appearing to them.

Exceptions are filed by both parties, to different items, and in one instance each side objects to the same item.

On the part of the heirs, the first objection is to the amount of the vendue list. In a prior account in part, filed by the executors, they had charged themselves with the account of sales at vendue, $2584 56. The present auditors, on examining this account, discovered several errors in the addition, and made the real amount $2473 81. It was right to correct this error and charge the latter sum. The heirs had objected to that account, and it had never passed the Orphans' Court. Errors in favor of the executors are here corrected, and why not those against them. If the vendue list had been lost, it might be right to charge the executors with what they had stated to be its amount; but this addition is of the items of the same paper from which the former was incorrectly taken.

The auditors allowed *Robert Sterrett* $500, and *John Sterrett* $200, as compensation for time, trouble, expense and counsel fees. The personal estate exceeded $9500, and a large real estate was to be sold, and the money distributed among the heirs. It was sold to the heirs, or rather a part to two heirs, and another part to two other heirs, and in some way all, or a great part of the purchase money settled, and is not before us. The heirs say the allowance is too large; they insist on the delay of the executors, the difficulty in obtaining a settlement, the loss by *John Sterrett*, &c. The executors object, that they are charged with interest on all sums upon the debet side of the account, which came to them ten years ago,

(Sterrett's Appeal.)

and no interest is allowed on their compensation. The evidence before the auditors, on which they acted, is not before us. It sometimes does great injustice to correct matters founded on facts and evidence, by supposition and theory. Where an executor receives money each year, for a number of years, and pays it away nearly as he receives it, perhaps it is always correct to allow the per centage when that particular transaction was completed. But when money has been collected and never paid away, but used by the executors, and some of it squandered, it may be right to allow no per centage at all.

Where an estate is so situated, that legal advice is proper to direct the course of the executors, or where they must bring suits to recover part of the estate, or defend suits brought against them, counsel must be employed; and where they are employed to obtain what is honestly supposed to be the rights of· the estate, the estate ought to pay the reasonable counsel fees. But where executors neglect to settle and pay, and are sued by creditors, or cited by heirs, and employ counsel to defend them in their iniquity, no counsel fees should come from the estate. The man who is doing wrong must himself pay the expense of that wrong. When heirs are asking from executors what is unreasonable, they may defend against this, and the heirs ought to bear the expense of their unjust claim. In this case we think the allowance large enough; but as we are not informed of all the facts and circumstances, we don't know why such a difference was made in the allowance; we suppose nothing was allowed for time or expense in this proceeding; we therefore make no alteration.

After charging each of the executors with the proportion of the vendue money which could be traced to their hands, there remained $361 90; as to this sum, there is no evidence which of the executors collected it, and the auditors think it ought to be charged to *John*, the deceased executor. We see no reason for this. *Robert* is allowed more than twice as much as *John* for time and trouble; why say he did less than *John?* On all that appears before us, we think *Robert* ought at least be charged with one-half of this sum; and we direct $180 95 to be added to the sum with which he is charged, and the same amount to be deducted from the amount charged to *John*.

There are some small items excepted to, about which the evidence is uncertain; we leave the report, as to these, unaltered.

As to the charge of money received from *Nathaniel Sterrett's* estate. This is to some extent admitted, but said to have been received since this account passed the Orphans' Court; and as it seems there are also other matters of similar kind, we only say we do not pass on this; it is left for future settlement.

(Sterrett's Appeal.)

As to the expenses of this account before auditors. The heirs ought not to pay this. The reasons are obvious. *Robert Sterrett* filed an account making the heirs his debtors; he owes them by this account nearly $2000. *Robert* and *John,* the executors, must pay this.

*Robert Sterrett* has filed two other exceptions. Because the auditors did not allow him the sum of $804, which he alleges he paid in May, 1815, to his co-executor *John Sterrett.* There is nothing to support this exception. The facts go far to negative it. *Robert* received above one thousand dollars, in April, and within a month paid to creditors of the estate as much; if he gave to *John* at that time, it was not money of the estate, but his own, and if lost, he must lose it; he cannot throw it on the heirs.

The next exception, as to the $761 92 paid *P. McClure,* is on no better footing. The proof is, that *John* paid that money. *John* borrowed from her the sum which he had just paid, and an additional sum, and gave his bond, with *Robert* as his surety. If *Robert* has been compelled to pay that bond, it was as surviving obligor of *John,* and not as executor of *James Sterrett's* estate.

The report, as corrected in the two items above mentioned, is confirmed.